UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

---

| | |
|---|---|
| UNITED STATES OF AMERICA, | Criminal No. 11-CR-0015 (DWF/LIB) |
| v. | **REPORT AND RECOMMENDATION** |
| TERESA LYNN HILL, also known as Teresa Lynn Drift-Hill, | |
| Defendant. | |

---

This matter came before the undersigned United States Magistrate Judge upon the Motion of the Defendant, Teresa Lynn Hill, to Suppress Evidence Obtained as a Result of Search and Seizure made on February 16, 2011. The case has been referred to the Magistrate Judge for report and recommendation under 28 U.S.C. § 636(b)(1) and Local Rule 72.1. The Court held a hearing on February 23, 2011 and received testimony from Bureau of Indian Affairs Officer Brent Chosa. For reasons outlined below, the Court recommends that the Defendant's Motion to Suppress be DENIED.

**I.   BACKGROUND**

On August 28, 2010, at approximately 4:30 a.m., Betty Drift reported to the Bois Forte Police that Vincent Hill had arrived at her home bleeding from a stab wound. Ms. Drift resides on Indian Point Road within the boundaries of the Bois Forte Indian Reservation. Bois Forte police officer Sergeant Brent Chosa, who was on call that morning, responded to the report. Sgt. Chosa, who was at home when he received at the call, dressed in his police uniform and travelled to Betty Drift's residence. Sgt. Chosa additionally called for backup from Officer Villebrun. As Sgt. Chosa approached the Drift residence, he activated his squad car camera.

After arriving at the residence, Ms. Drift and Mr. Hill came out of the house to meet Sgt. Chosa. While speaking with Ms. Drift and Mr. Hill, Sgt. Chosa observed that Mr. Hill was intoxicated because his speech was slurred and he smelled like alcohol.[1] Mr. Hill informed Sgt. Chosa that his wife Terri had stabbed him and that she was still at their house. Then, an ambulance took Mr. Hill to the hospital. Ms. Drift told Sgt. Chosa that Mr. Hill had also said to her that Defendant Terri Hill, his wife, had stabbed him. Additionally, Ms. Drift relayed to the officers that Mr. Hill stated that the Defendant, and the Defendant's brother, Michael Drift, had been drinking at the Defendant's house. She also relayed that Mr. Hill had said that Mr. Drift and the Defendant had been arguing and that the Defendant had attempted to stab Michael Drift with a knife; at that point, Mr. Hill intervened to break up the fight when he was stabbed by the Defendant. Ms. Drift further informed the officer that Mr. Hill told her that Michael Drift and the Defendant were still at the residence, but Mr. Hill had run to Ms. Drift's in order to escape the Defendant. Sgt. Chosa testified that he knew the Hills because the reservation is a small community, but didn't know Michael Drift, who was the Defendant's brother.

Next, Sgt. Chosa travelled to the Hill residence. Sgt. Chosa testified that at this time he was unsure whether Michael Drift, the Defendant, or anyone else was injured. While Sgt. Chosa's squad video shows Sgt. Chosa's encounter with Ms. Drift and Mr. Hill, it does not show Sgt. Chosa's initial arrival at the Hill residence. However, Sgt. Chosa testified that he parked his squad car directly in front of the house and directed a spotlight to shine on the entrance. Then, Sgt. Chosa and Officer Villebrun approached the house. Upon approaching the house, Sgt. Chosa viewed blood on the pavement. The Defendant spontaneously opened the front door, but remained in the doorway. Sgt. Chosa testified that he then approached the Defendant quickly

---

[1] Although Sgt. Chosa was able to note signs of alcohol consumption, he also testified that Mr. hill was nonetheless understandable and coherent in his responses to questions.

because he was concerned for his safety even though he did not view any weapon in the Defendant's hand. In addition, Sgt. Chosa observed that the Defendant's shirt had blood on it. Sgt. Chosa informed the Defendant that her husband, Vincent Hill, had accused her of stabbing him. The Defendant denied the accusations. Sgt. Chosa observed that the Defendant appeared intoxicated and smelled like alcohol.

While speaking to the Defendant, Sgt. Chosa testified that he saw a rug in the kitchen area with a blood stain. Sgt. Chosa testified that while he was speaking with the Defendant, she was in the kitchen area at the entrance to her home and he was just outside the door. After speaking with the Defendant, Sgt. Chosa crossed the doorway and entered the Defendant's home to arrest her. Sgt. Chosa and Officer Villebrun escorted the Defendant out of her home in handcuffs, which is the first event depicted on the squad video. The officer placed the Defendant in Sgt. Chosa's squad car where, after warning, she invoked her right to remain silent.

After placing the Defendant in his squad car, Sgt. Chosa proceeded back to look inside the house and outside the house for Michael Drift. In the home, Sgt. Chosa again observed drops of blood in the kitchen and the entryway. Eventually, Sgt. Chosa found Michael Drift hiding in the brush outside the Defendant's house. Sgt. Chosa noticed that Michael Drift had been drinking and was intoxicated.[2] Sgt. Chosa asked Michael Drift what happened that night. Michael Drift explained that his sister, the Defendant, stabbed Vincent Hill. While Michael Drift was talking with Sgt. Chosa in front of the house, Officer Villebrun walked past him, entered the house and looked around.[3] At the same time, Michael Drift told Sgt. Chosa his name, date of birth, and mailing address. Michael Drift gave Sgt. Chosa the Grand Rapids address of his

---

[2] Even though Sgt. Chosa testified that he was able to note signs of alcohol consumption, he also testified that Michael Drift was nonetheless understandable and coherent in his responses to questions.

[3] From the motion pleadings, it does not appear that the Government will be seeking to offer into evidence any observations made by Officer Villebrun; nor, is there any evidence in the record that Officer Villebrun communicated any of his observations to Sgt. Chosa before Sgt. Chosa reentered the premise with Michael Drift.

3

mother, but stated, "I stay at my sister's house." Sgt. Chosa asked Michael Drift "where did the stabbing take place actually." Michael Drift responded "right here" and led Sgt. Chosa into the house where he again explained the details surrounding the stabbing. While in the house, Sgt. Chosa took photographs which were entered into evidence as Government exhibits 1-4.

In the present motion, the Defendant seeks to suppress any evidence obtained as the result of the improper seizure of the Defendant stemming from a warrantless arrest and the warrantless search of the Defendant's home. The Court considers each of the Defendant's arguments below.

## II.  DISCUSSION

### A.  Warrantless Arrest

Defendant first argues that the officers arrest was invalid because they entered the house to arrest the Defendant without a warrant. The Government responds that the arrest was lawful because the officers had consent to enter the Defendant's home and, alternatively, the arrest was justified by probable cause combined with exigent circumstances.

The Fourth Amendment guarantees the right of individuals "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures...." U.S. Const. amend. IV. The Fourth Amendment "prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest." Payton v. New York, 445 U.S. 573, 576 (1980). "While Payton did not deal with the issue of whether an initial consensual entry would justify a subsequent warrantless arrest, we have held that a valid and voluntary consent may be followed by a warrantless in-home arrest." United States v. Hampton, 260 F.3d 832, 835 (8th Cir. 2001) (citing United States v. Briley, 726 F.2d 1301, 1303 (8th Cir.

1984)).  Thus, a warrantless arrest is valid if the defendant "voluntarily and without coercion consented to the officer's entry into his home."  Id.[4]

The Defendant compares the present case to United States v. Poe, 462 F.3d 997 (8th Cir. 2006).  In Poe, the Eighth Circuit held that a police officer's entry into the defendant's home after the defendant opened the door did not constitute consent.  However, the Court finds Poe distinguishable from the present case.  The Eighth Circuit stated that "[a]lthough a person who opens a door in response to a simple knock by officers knowingly exposes to the public that which can be seen through the door, we have held that one who does so in response to a demand under color of authority does not open the door voluntarily."  Poe, 462 F.3d at 1000 (citations omitted).   In Poe, the Court found that the officers demanded that the door be opened by knocking persistently for ten minutes, stationing officers at both the front and back entrance, and commanding the defendant to open the door.  No such extreme situation exists in the present case.

Here, the officers did not demand over a great length of time by means that demonstrated significant police power that the Defendant open the door.  Rather, the Defendant opened the door voluntarily before the officers had even first reached the door.  The officers never even had a chance to knock on the door.  The Defendant argues that the shining of a spotlight on the door rises to the level of a coercive demand, but the Court remains unconvinced.  The spotlight merely helped the officers to illuminate the scene of a remote rural property prior to sunrise.  A reasonable person in the Defendant's situation, unlike in Poe, would not conclude from the facts presented that she "had no choice but to acquiesce and open the door."  Id.

---

[4] The Court notes that since the Defendant does not challenge that probable cause exists, but instead only argues that no valid consent or exigent circumstances existed justifying the officer's entry into the Defendant's home and eventual arrest, the Court assumes for the purposes of its analysis that probable cause exists.

Instead, the Court finds the present case comparable to Hampton, supra, and United States v. Vaneaton, 49 F.3d 1423 (9th Cir. 1995). In Hampton, the police knocked on the screen door of the defendant's home which separated the porch from the main house. 260 F.3d at 833. After answering, the Defendant held the storm door open and left the front door to the main house open behind him. Id. The police asked the defendant for identification. Id. The defendant told the police it was inside and held the door open to admit them. Id. Police followed the defendant and placed him under arrest after confirming he was the suspect. Id. The court found the arrest to be lawful because the defendant consented to the officers' entry into his home because he "literally opened the door to admit them into his home." Id. at 835.

Likewise, in Vaneaton, the court found the defendant's arrest to be valid when the defendant was arrested while standing just inside the open door of his motel room. 49 F.3d at 1424. The question presented was not only whether the defendant was standing "inside or outside the threshold of his room, but whether he voluntarily exposed himself to warrantless arrest by freely opening the door of his motel room to the police." Id. at 1426 (citations and quotations omitted). The Ninth Circuit subsequently limited Vaneaton in United States v. Quaempts, 411 F.3d 1046 (9th Cir. 2005). In Quaempts, the court found a warrantless arrest invalid when the defendant answered the door to his small home from his bed because the bed constitutes "the sanctuary of the right to privacy. Quaempts, 411 F.3d at 1048 (citing Lawrence v. Texas, 539 U.S. 558 (2003)). Thus, the Quaempts court refused to extend the holding of Vaneaton to situations where the police were forced to enter an area beyond the threshold of the home in order to effectuate an arrest. The Quaempts court noted that "[i]n Vaneaton a majority of the panel concluded that when a person opens the door in response to a police knock, and thereby stands on the threshold of the home, that person is no longer in a private place." Id.

The analysis in <u>Vaneaton</u>, <u>Hampton</u>, and <u>Quaempts</u> cautions the Court to examine whether the Defendant voluntarily consented to opening the door to the police without coercion by the officers and whether the police were required to enter beyond the threshold of the home in order to effectuate the arrest. In the instant case, as discussed in the above analysis, the police did not make a show of force to coerce the Defendant into opening the door and speaking with the officers. <u>See</u> <u>United States v. Saari</u>, 272 F.3d 804, 809 n. 4 (6th Cir. 2001) (distinguishing the case from <u>Vaneaton</u> because there the officers did not make a show of force making it clear that the defendant had no choice to present himself while in <u>Saari</u> the officers positioned themselves in front of the only exit from defendant's apartment with their guns drawn, knocked forcefully, and instructed to come outside making it clear that the defendant was not free to leave). Instead, as in <u>Hampton</u>, the Defendant "literally opened the door to admit them into [her] home." 260 F.3d at 835; <u>see</u> <u>also</u> <u>United States v. Mason</u>, 661 F.2d 45, 47 (5th Cir. 1981) (holding that no Fourth Amendment violation occurred when defendant came to doorway as agents approached the house and was then placed under arrest). Furthermore, like in <u>Vaneaton</u>, the police did not enter any area of the home beyond the threshold in order to effectuate the arrest. The Defendant contends that because the arrest took place in the kitchen, situated near the entryway, the officers entered beyond the threshold. However, the layout of the Defendant's home essentially made the kitchen part of the entryway because the door opened directly into the kitchen area as evinced by squad video of the encounter at the Defendant's house showing a kitchen cabinet directly to the left of the doorway. Thus, the warrantless arrest was proper and the Court recommends that the evidence obtained as a result of the arrest not be suppressed.[5]

---

[5] The Court notes that even if the arrest of the Defendant was not valid under a consent theory, the police also could have validly arrested the Defendant because exigent circumstances arguably existed in this case. A warrantless arrest is also valid if exigent circumstances exist. <u>Payton</u>, 445 U.S. at 590; <u>United States v. Spotted Elk</u>, 548 F.3d 641, 651 (8th Cir. 2008). Exigent circumstances include situations in which the life of a person in the home is at

7

### B. Warrantless Search of the Defendant's Home

#### 1. First Entry Justified by Exigent Circumstances

Defendant argues that the evidence obtained as a result of the warrantless search of the Defendant's home should be suppressed. From the Defendant's memorandum in support of her motion to suppress, it appears that the Defendant does not challenge the first search made by the officers into the Defendant's house, but instead challenges their second entry when Sgt. Chosa took photographs of the scene and Michael Drift explained and demonstrated how the stabbing occurred. However, for the sake of completeness, the Court will first analyze whether the initial entry was lawful.

Warrantless searches and seizures are constitutional only if supported by a showing of probable cause, and exigent circumstances. See Kirk v. Louisiana, 536 U.S. 635, 638 (2002)(noting that "police officers need either a warrant or probable cause plus exigent circumstances"). "[T]he police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests." Welsh v. Wisconsin, 466 U.S. 740, 749-50 (1984). However, the Court has recognized a small number of such exigent circumstances including the "hot pursuit" of a fleeing felon, see United States v. Santana, 427 U.S. 38, 42-43, (1976), a risk of destruction of evidence, see Schmerber v. California, 384 U.S. 757, 770-71 (1966), and threats of violence or danger to human life, see Welsh v. Wisconsin, 466 U.S. at 748.

---

risk, the suspect's escape is imminent, or evidence is about to be destroyed. Radloff v. City of Oelwein, 380 F.3d 344, 348 (8th Cir. 2004). Here, exigent circumstances were present suggesting that the life of Michael Drift was in danger necessitating the officers entry into the Defendant's home. Ms. Drift informed the police officers that Mr. Hill stated Michael Drift was still at the Hill residence. Additionally, the police learned from Ms. Drift that Mr. Hill claimed that he was injured while trying to break up a disagreement between Mr. Hill and the Defendant. As such, the police could have reasonably believed that Michael Drift was still in danger when they pulled up to the Defendant's house. Furthermore, upon arriving at the house, the officers noticed that the Defendant had blood on her shirt and blood on the entry way steps and pavement making it likely that some sort of violence had occurred at the house and they could not rule out that Michael Drift was in danger. Moreover, the officers could yet have reasonably believed that the Defendant could cause potential further harm to Michael Drift unless he could be located and his condition determined.

When attempting to demonstrate the existence of exigent circumstances, the State "must establish that the circumstances as they appeared at the moment of entry would lead a reasonable, experienced law enforcement officer to believe that someone inside the house ... required immediate assistance." United States v. Arch, 7 F.3d 1300, 1304 (7th Cir. 1993).

In the present case, exigent circumstances existed justifying the police's initial entry into the Defendant's home. After speaking with Ms. Drift, the officers learned that the Defendant's husband, Mr. Hill, had reported that Michael Drift was still at the Hill residence with the Defendant. In addition, the police were aware that the cause of Mr. Hill's stabbing injuries may have been related to his role in attempting to break up a fight between the Defendant and her brother, Michael Drift. Furthermore, the officers knew that, according to Mr. Hill, the Defendant had a deadly weapon in her possession namely a knife that could be used to stab Michael Drift who the police had a reasonable basis to believe was still at the Hill residence. Therefore, the police knew that Michael Drift could reasonably be in danger. This belief was made stronger when after arriving at the Hill residence, the Defendant came to her doorway in a blood stained shirt and the officer viewed blood on the pavement outside the home and inside the entryway. As such, the officers had a reasonable basis to believe that Michael Drift was still within the Hill residence and could be harmed and in need of immediate medical assistance.

The Defendant asserts that exigent circumstances did not exist for the officers to enter her home in this case because the police had no information that anyone else other than Mr. Hill had been injured and the police spoke to the Defendant who was unarmed without even asking her whether Michael Drift was in the house. However, the Court is not persuaded by the Defendant's arguments. It is immaterial whether Michael Drift was actually injured or whether the officers definitely knew that someone else was injured. Instead, the Court examines whether

police reasonably believed that individuals might be injured. Here, the police were justified in believing that Michael Drift may be injured considering the circumstances outlined above. Furthermore, the officers' failure to ask the Defendant about her brother, Michael Drift, does not detract from the officer's reasonable belief. There are a number of reasons why the officers may have decided to simply arrest the Defendant before asking her about her brother. Additionally, immediately after arresting the Defendant, the police began searching for Michael Drift in the house and then when he could not be found in the house they searched the brush surrounding it. The squad car video demonstrates the officers concern for his safety by their continued calls of his name.

Therefore, the officers' initial entry into the home to search for Michael Drift was justified. See United States v. Janis, 387 F.3d 682, 687 (8th Cir. 2004) ("We have long held the view that legitimate concern for safety of individuals may constitute 'exigent circumstances' justifying warrantless entries and searches"). Anything the officers observed that was in plain view during this first entry need not be suppressed.

### 2. Valid Consent Rendered the Second Search Lawful

As to the second search, the Defendant argues that the search violated the Fourth Amendment because Michael Drift did not have apparent or actual authority to consent to the search.

"An officer with consent needs neither a warrant nor probable cause to conduct a constitutional search." United States v. Pennington, 287 F.3d 739, 746 (8th Cir. 2002). In determining whether an individual has expressed consent, "[t]he precise question is not whether [the accused] consented subjectively, but whether his conduct would have caused a reasonable person to believe that he consented." United States v. Jones, 254 F.3d 692, 695 (8th Cir. 2001

"Consent can be inferred from words, gestures, and other conduct." Id. (citing United States v. Mendoza-Cepeda, 250 F.3d 626, 627 (8th Cir. 2001)). "In other words, a person can render a search legal by behaving in a way that would cause a reasonable person to believe that he or she has knowingly and voluntarily consented, whether or not the person actually intends to consent." United States v. Cedano-Medina, 366 F.3d 682, 684-85 (8th Cir. 2004). Essentially, the Fourth Amendment requires that an officer reasonably believes that he has received consent to search. Id. at 685. A court must determine "whether the totality of the circumstances demonstrates that the consent was voluntary." United States v. Chaidez, 906 F.2d 377, 380 (8th Cir. 1990) (explaining that courts must look at the characteristics of the defendant and at the details of the environment in considering whether the totality of the circumstances shows voluntary consent). Consent may be obtained from the individual whose property is searched, or in certain instances, from a third party who possesses either actual authority or apparent authority to consent to the search. See United States v. Matlock, 415 U.S. 164, 169-72 (1974) (discussing actual authority); Illinois v. Rodriguez, 497 U.S. 177, 186-89 (1990) (discussing apparent authority). The government has the burden of proving that the consenting party had such authority. See United States v. McAlpine, 919 F.2d 1461, 1463 (10th Cir. 1990) (actual authority); United States v. Kimoana, 383 F.3d 1215, 1222 (10th Cir. 2004) (apparent authority).

A third party has apparent authority to consent to a search if a police officer reasonably, but erroneously, believes that the third party has actual authority to consent. Georgia v. Randolph, 547 U.S. 103, 109 (2006). In analyzing apparent authority, a court must determine whether "the facts available to the officer at the moment ... warrant a man of reasonable caution [to believe] that the consenting authority had authority over the premises[.]" Illinois v. Rodriguez, 497 U.S. 177, 188 (1990). Even though other courts have interpreted prior Supreme

11

Court case law "to require police to go behind appearances to verify third party authority," the Eighth Circuit "has been more liberal about allowing police to form their impressions from context." United States v. Almeida-Perez, 549 F.3d 1162, 1171 (8th Cir. 2008) (citing cases from the Tenth Circuit and the D.C. Circuit). While police officers have "some responsibility . . . to assess the situation critically," they "are entitled to draw the usual inferences from what they see and hear, even though further inquiry might prove their inferences wrong." Id. at 1170. Common authority "is not to be implied from the mere property interest of the third party but rests on the mutual use of the property by persons hav[ing] joint access or control . . ." United States v. Matlock, 415 U.S. 164, 172 (1974).

Here, the Government asserts that apparent authority existed because Michael Drift told the police officers that he was then "staying" with his sister - the Defendant. The Defendant responds that Sgt. Chosa could not have reasonably believed that Michael Drift had the authority to consent to the search because he knew the Defendant and her husband, Mr. Hill, where they lived, and would, the Defendant infers, have necessarily been aware of who was "staying" with them; however, Sgt. Chosa testified he did not know Michael Drift and asked him for his mailing address. Therefore, according to the Defendant, Sgt. Chosa could not form a reasonable belief that Michael Drift was "staying" at the Hill residence.

The Court finds the Defendant's arguments unpersuasive. The record does not establish Sgt. Chosa knew the Defendant and her husband so well that it would have been well enough that he would have previously been fully aware of whether Michael Drift was actually staying with the Defendant. Just because Sgt. Chosa knew who the Defendant and her husband were does not mean that he would necessarily know before hand whether the Defendant's brother had come to stay with them. Furthermore, and more importantly, Michael Drift himself informed

Sgt. Chosa that he was then "staying" with the Defendant.  Sgt. Chosa had no reason to doubt Michael Drift's statement and reasonably relied on Michael Drift's word instead of his general knowledge of the Bois Forte community.

As such, the Court finds the officers reliance on Michael Drift's statement that he was then "staying" with the Defendant reasonable.  This statement provided the requisite apparent authority that Michael Drift could consent to the search of the residence.  A reasonable person in the shoes of the officers in the present case would believe that staying with the Defendant meant that as a guest of the Defendant Michael Drift enjoyed common authority over the Hill residence because he possessed "mutual use of the property."  Matlock, 415 U.S. at 172.

Additionally, the Defendant asserts that Michael Drift did not give actual consent to the search.  After locating Michael Drift, while near one of the squad cars, Sgt. Chosa began asking him questions about the events leading up to the stabbing of Mr. Hill.  Michael Drift repeated the story numerous times explaining how the Defendant stabbed Mr. Hill.  After repeating the story a couple of times, the squad video shows Sgt. Chosa asking Michael Drift where the stabbing took place.  Michael Drift says "right here" and enters the house.  At this point, Sgt. Chosa follows him into the Hill residence where Mr. Drift again explains the events surrounding the stabbing.  However, the Defendant argues that earlier acts by the officers negate any consent that Michael Drift gave to the search.  According to the Defendant, the fact that Officer Villebrun entered the residence while Sgt. Chosa was talking to Michael Drift outside the residence before Michael Drift went into the residence cancels any subsequent consent given by Michael Drift.

The Court remains unpersuaded by the Defendant's arguments.  Here, Sgt. Chosa asked Michael Drift where the stabbing and events surrounding the stabbing occurred, and it was while responding to this question that Mr. Drift voluntarily lead Sgt. Chosa into the home.  By entering

13

into the residence, Michael Drift consented to the search of the home. The fact that Officer Villebrun entered the home before Michael Drift gave his consent does not negate the consent because Michael Drift did not object to Officer Villebrun entering the home, nor did the squad video show Officer Villebrun take any photos or collect any evidence that could be used by the Government.[6] Furthermore, Officer Villebrun did not search the residence beyond the area searched during the initial exigent circumstances search when the officers looked for Michael Drift in the home. Therefore, anything Officer Villebrun may have viewed during his second entry into the home was evidence that he already found in plain view during his initial search with Sgt. Chosa.

As such, Michael Drift had apparent authority to consent to the search of the residence and did consent to the search.

### C. The Plain View Doctrine

Lastly, even though the parties did not bring up the issue, for the sake of completeness, the Court notes that even if Michael Drift lacked apparent authority to consent to the search of the Hill residence, the evidence seized as a result of the search would be admissible under the plain view doctrine.

The plain-view doctrine is another exception to the warrant requirement. Once lawfully inside a home, police may seize obviously incriminating items that are in plain view. United States v. Chipps, 410 F.3d 438, 442-43 (8th Cir. 2005). The plain view doctrine encompasses photographs taken of evidence in plain view and "to that extent seizing those views themselves as evidence." United States v. Espinoza, 641 F.2d 153, 167 (4th Cir. 1981). However, the recording of "visual images of a scene by means of photography does not amount to a seizure because it does not meaningfully interfere with any possessory interest." Bills v. Aseltine, 958

---

[6] See footnote 3, supra.

F.2d 697, 707 (6th Cir. 1992).  Thus, officers can lawfully "record by photography scenes presented to their plain view."  Id.; United States v. Mancari, 463 F.3d 590, 596 (7th Cir. 2006) (citing Arizona v. Hicks, 480 U.S. 321 (1987)) (determining that "snapping a picture of a pile of cash that was in plain view, the police did not 'meaningfully interfere' with Mancari's 'possessory interest').

As such, the pictures taken during the second entry into the Defendants' home did not rise to the level of a seizure under the Fourth Amendment because the blood stains were in plain view of the officers.[7]  However, the Court must still analyze the remaining question of whether the fact that the officers' viewed the blood stains in plain view during their initial entry into the Defendant's house can be used as justification for their decision to reenter the residence and take pictures of the blood stains.

Courts have been willing to allow officers to seize evidence based on the plain view exception when the police reenter a home and retrieve evidence that they viewed during an initial search based on exigent circumstances.  Harris v. Ford, 369 Fed. Appx. 881, 888 (10th Cir. 2010) (refusing to find that a reentry to seize evidence after an initial lawful exigent circumstances search did not clearly violate the Fourth Amendment such that it could form the basis of a § 1983 action); State v. Coulter, 67 S.W.3d 3 (Tenn. Crim. App. 2001); Wofford v. State, 952 S.W.2d 646, 653 (Ala. 1997); State v. Magnano, 528 A.2d 760, 764 (Conn. 1987); State v. Johnson, 413 A.2d 931, 933-934 (Maine 1980); Hunter v. Commonwealth, 378 S.E.2d 634, 635-636 (Va. 1989); La Fournier v. State, 280 N.W.2d 746, 750-751 (Wis. 1979).

---

[7] The Supreme Court has stated that " '[i]t is important to distinguish "plain view," as used ... to justify seizure of an object [which implicates the Fourth Amendment], from an officer's mere observation of an item left in plain view,' " which does not implicate the Fourth Amendment. Horton v. California, 496 U.S. 128, 133 n. 5 (1990). The Fourth Amendment protects against unreasonable searches and unreasonable seizures.  "A search compromises the individual interest in privacy; a seizure deprives the individual of dominion over his or her ... property." Id. at 133. "As explained by the Supreme Court, the plain view doctrine really has no relevance to a search because it does not implicate any privacy concerns." PPS, Inc. v. Faulkner County, Ark., 630 F.3d 1098, 1102 (8th Cir. 2011).

Even though, as discussed above, a photograph does not exactly constitute a seizure falling under the plain view exception, the circumstances of returning into a suspect's house to obtain a photograph are different from cases where the officer merely sees the evidence while passing through the house. Returning into a suspect's home to take a photograph necessarily involves more of a privacy invasion than simply seeing an object as one walks through a house in response to exigent circumstances. As such, the Court finds the cases cited above analyzing returning into the house to seize evidence to be analogous to the case at hand considering that no Eighth Circuit case has directly analyzed the circumstances surrounding a warrantless second entry to take photographs of physical evidence without retrieving the actual evidence itself.

Generally, courts consider the subsequent re-entry in order to actually collect the evidence to be a continuation of the original entry. Magnano, 528 A.2d at 764. Other courts have determined that once the police lawfully enter the premises, the defendant no longer holds a reasonable expectation of privacy within the home to that extent of the initial invasion. Wengert v. State, 771 A.2d 389, 399 (Md. 2001); United States v. Brand, 556 F.2d 1312, 1317 (5th Cir. 1977); United States v. Roberts, 619 F.2d 379 (5th Cir. 1980). Furthermore, Courts have limited the second entry to the scope of the initial invasion. Brand, 556 F.2d at 1317 n. 9.

In this case, the officers re-entered the Defendant's home and proceeded to take pictures of blood stains that they had earlier viewed when searching for Michael Drift pursuant to exigent circumstances. Therefore, the officers stayed within the living area of the house and did not enter any area beyond the area initially examined when looking for Michael Drift. Moreover, the search took place without any break in contact with the scene and within a relatively short time after the initial exigent circumstances search. Here, the officers first entered the home to locate Michael Drift and then continued to search for him outside. Once the officers found Michael

Drift, they asked him questions about the evening's events and then with consent proceeded to reenter the house. According to the squad video, the whole incident took less than 25 minutes. Upon reenter, the officers did not expand the scope or nature of the initial search. Furthermore, the Court notes that it would have been unreasonable to expect the officers to take the photographs during their first entry into the Defendant's home because the officers were preoccupied with finding Michael Drift believing that he could be in physical danger. LaFournier, 280 N.W.2d at 751 (finding second entry lawful where the police enter a residence under exigent circumstances but are unable to preserve evidence observed in plain view while rendering assistance). Additionally, the Court finds it unreasonable to expect an officer to stop and obtain a warrant to take photographs of evidence that he has already seen during an initial lawful search of the house. Thus, the second search was lawful as well.

### III.   CONCLUSION

1. Based on the foregoing, and all the files, records and proceedings herein,

    **IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Docket No. 20] be **DENIED**.

Dated: March 31, 2011                                                                  s/Leo I. Brisbois
                                                                                              LEO I. BRISBOIS
                                                                                              United States Magistrate Judge

### N O T I C E

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties **by April 14, 2010**, a writing that specifically identifies the portions of the Report to which objections are made and the bases for

each objection. A party may respond to the objections within fourteen days of service thereof. Written submissions by any party shall comply with the applicable word limitations provided for in the Local Rules.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  This Report and Recommendation does not constitute an order or judgment from the District Court, and it is therefore not directly appealable to the Court of Appeals.